Atlantic Bank *v.* Merchants' Bank.

President, Directors & Company of the Atlantic Bank *vs.* President, Directors & Company of the Merchants' Bank.

By a fraudulent conspiracy between the paying teller of the Merchants' Bank, the teller of the Atlantic Bank, and a broker, the broker drew a check on the Merchants' Bank, where he had no funds, which the paying teller marked " good," and the broker took it to the teller of the Atlantic Bank, who gave him the money for it in current bills, partly on the Atlantic Bank and partly on other banks. The broker took these to the Merchants' Bank, and gave them to the paying teller, who, for the purpose of covering a deficit, unknown to any other of the bank officers, in his cash, which was to be counted that afternoon, placed them with it. The purpose for which the money was obtained was known to the two other parties, but no other officer of either bank knew anything of the transaction. The paying teller's cash was produced by the cashier to the directors, and counted by them that afternoon, approved and returned to him. The next morning he committed suicide, the check was presented at the Merchants' Bank and payment refused. *Held,* that the Merchants' Bank could not hold the money as against the Atlantic Bank, and were liable to the latter, after demand, in an action for money had and received. Bigelow and Merrick, JJ. dissenting.

Action of contract to recover $25,000, as money had and received by the defendants to the plaintiffs' use on the 26th of March 1855, with interest. Writ dated May 3d 1855. Answer, that the defendants never received the money, and did not owe it or any part of it to the plaintiffs.

At the trial before *Bigelow*, J. it appeared that the sum sought to. be recovered was taken from the Atlantic Bank, by a fraudulent˙ conspiracy between Richard Ward, teller of that bank, Thomas W. Hooper, paying teller of the ˏMerchants' Bank, and Augustus S. Peabody, a broker, to cover a deficit in Hooper's cash, which was about to be counted, and was used by Hooper for that purpose; and that before it was returned Hooper committed suicide.

Peabody testified as follows : " I was a stock and exchange broker in Boston from 1845 till September 1855. On Monday, the 26th of March 1855, I drew a check on the Merchants' Bank ˙for $25,000, and Thomas W. Hooper, late the paying teller of that bank, wrote across its face the words, ' Good. T. W. Hooper, Teller.' A quarter before two o'clock on the same day I obtained upon this check from Richard Ward, late the paying teller of the Atlantic Bank, $25,000 in bank notes ; $16,000 in

Atlantic Bank bills of $500 each, and the residue in bills of other Boston banks. At precisely two o'clock on the same day I delivered them to Hooper at the counter of the Merchants' Bank. I waited till he counted the bills and pronounced them correct; I then saw him take the Atlantic Bank bills, and put them into a strap, which he marked with his pen and ink; the remainder of the bills he put into another strap, which he also marked; both of these packages he then put into the drawer in which he kept the money which he usually paid out. I had applied to Ward for the money at Hooper's suggestion.

" On the previous Thursday I drew a similar check, and at Hooper's suggestion applied to Ward for the money for it, stating to him that they were going to count Hooper's cash that day, and that Hooper wanted to know if he would let him have that till next day; that he might send in the check on the next day and he would pay it, and the Atlantic Bank should not lose any credit (specie credit) thereby. Ward then gave me a specie credit for $15,000, and $10,000 in bills, which I carried to the Merchants' Bank, and gave to Hooper; the bills I saw him put in the drawer; what disposition he made of the specie credit I don't know. The next day (Friday), being in the Merchants' Bank in the morning, Hooper said to me, ' I did not have occasion to use that money yesterday, and you had better take this down to Mr. Ward,' handing me, at the same time, a Merchants' Bank specie credit for the same sum I had given him the day previous, and the balance in bills, making up $25,000. This amount I carried to the Atlantic Bank and gave to Ward. He gave me back my check, certified by Hooper, which I carried to the Merchants' Bank, and handed to Hooper, as a voucher that I had paid it.

" On the following Monday Hooper sent for me to come to the bank, and said, ' I shall want that money to-day.' I took a blank and filled out this check, and handed it to Hooper, who returned it to me, with the words, ' Good. T. W. Hooper, Teller,' written upon its face. I then went to the Atlantic Bank, and handed the check to Ward, and said, ' They are going to count the cash to-day at the Merchants'. Mr. Hooper

45 *

wants that.'  Ward handed me the bills, which I carried to the Merchants' Bank and gave to Hooper.  He gave me no receipt or other evidence of my having left the money.  I did not speak to any one at the Atlantic Bank, except Ward, in regard to the check.  I had no bank account then at either bank.  The bank bills delivered by me to the Merchants' Bank were not in payment or on account of any liability of my own.

"I had no conversation with any officer of the Merchants' Bank till the following day, when I learned of Hooper's death, and immediately went to the Merchants' Bank, and told Mr. Haven and others who came in, I think directors of the bank, all the circumstances attending getting the money on the check, and giving it to Hooper.  Upon my telling Mr. Haven there were two checks drawn by me for $25,000 each, he said, very emphatically, ' The bank will not pay them; when they are presented, I shall give instructions to have them sent back at once; Mr. Hooper had no authority for certifying checks.'  He questioned me closely as to why I gave the checks ; what representations Hooper could have given me which should have led me to draw the checks.  He said that he was sorry I did so, as it placed me in a bad fix."

Ward testified :  " I was teller of the Atlantic Bank in March 1855, up to the 29th.  I received this check from Peabody on the 26th of March 1855.  I paid the money for it, $25,000, in bank notes, of which $16,000 were in bills of the Atlantic Bank, and the remainder, $9000, in bills of other Boston banks.  The $25,000 were owned by the Atlantic Bank.  I took the bank bills from the drawer in which I kept the money, and put the check into the drawer.  I had no authority from the president or directors to pay this check.

" I let money go on a check like this on the Thursday previous, to Peabody.  I then gave him $10,000 in Atlantic Bank bills of $500 each, and $15,000 in a specie credit.  A specie credit is a slip of paper on which is written the name of the bank, the date and amount of the credit.  The slip is headed with the name of the bank, and not signed.  The next morning, Friday, Peabody came in and brought me $10,000 in bills,

and a specie credit of the Merchants' Bank for $15,000, a different credit. I cannot recollect whether or not the bills were the same. The transaction of March 23d was not known to the president and directors of the Atlantic Bank.

" It was my practice to make a list of bills and checks against every bank, and send it as soon as I could after the bank opened. The Merchants' and Suffolk Banks did not settle in the morning. They would say: ' The Atlantic owes;' and the messenger would leave the list, and at twelve o'clock we would settle, and we would send in what we received between nine and twelve. If they sent back anything, it was by the messenger of the Atlantic Bank. It is the duty of the paying teller to make up the account. I sent a list, on the morning of 27th March, to the Merchants' Bank, of all I had, except the check dated the 26th for $25,000. I sent checks, bills, &c.

" I put the check for $25,000, which I received from him on the 26th of March, in the drawer with the ordinary funds of the bank. I make up my accounts daily. I called each of these checks for $25,000 money.

" On the 27th of March the slip or list from the Merchants' Bank came to the bank before ten o'clock in the morning. It was not in Hooper's handwriting. The check of the 26th of March for $25,000 was sent in before noon to the Merchants' Bank, with my second list and $2,729.65 Atlantic Bank bills, which, with this check, made the accounts even. This check came back, and I then spoke to the cashier about it, and by his direction I gave them a specie credit of $25,000. After I had given the credit, I took the check to the cashier, and gave it to him. This was before twelve o'clock. The first that the president or directors of the Atlantic Bank knew of this check was in that forenoon.

" I heard of Hooper's death about ten o'clock in the morning of the 27th of March. It was after my messenger had returned, and not from him, that I heard of it."

Benjamin Dodd, cashier of the Atlantic Bank, testified : " The first I saw of the check of March 26th was about eleven o'clock in the morning of the 27th. I had no knowledge of the

check of the 22d of March, and the transactions connected with it, until some time in April. Ward had no authority to make any loan to Peabody.

" Ward, on the 27th of March, handed me the check dated March 26th 1855, and said he had sent it up and it came back. I handed it to the messenger with directions to go up and demand payment. The messenger returned the check unpaid, and it was put in the hands of a notary and protested before two o'clock for non-payment.

Franklin Haven testified : " I am the president of the Merchants' Bank, and was in March 1855. Thomas W. Hooper was paying teller of the bank during the month of March 1855. The words, ' Good. T. W. Hooper, teller,' written across the check, are in his handwriting. Hooper had no authority in behalf of the Merchants' Bank to make it."

" We count our cash once a quarter, in accordance with an established practice. It was usual to give notice at two o'clock, or about that time, to the teller that cash was to be counted, so that he might be there. On the 26th of March 1855, the directors agreed to return after bank hours in the afternoon and count the cash. I stated to Hooper as I passed out of the bank, at a quarter before two o'clock, that the cash would be counted that afternoon. Hooper was the first teller ; he is accountable for all the cash. His cash should correspond with the first bookkeeper's balance. I returned about three o'clock. Hooper was in the business room. We counted in the directors' room. I took all the checks out of the drawers of the receiving and paying tellers after they had listed them. I made a list of them. This took me an hour. At four o'clock Luke Fay, a director, came in. No director had been in meanwhile. The money was brought from the general banking room into the directors' room by Stimpson, the receiving teller. The bills were assorted in packages of the respective banks. I noticed and was annoyed at the large amount of Grocers' Bank bills — $73,000. I then observed two packages of Atlantic Bank bills : one of $16,000 in bills of $500 or $1000 each; and the other of $31,000. The amounts did not attract my attention. My curi-

osity was excited by finding two packages. I put the question to the cashier, ' Why there should be two packages ? ' He said he did not know. On hearing this, Fay asked, ' Why should it be known outside of the bank that the cash was to be counted ? ' I said, ' Perhaps one of the directors mentioned it.' He said, ' No ; it did not come from them.' Just then Hooper came into the room, and I put the same question to him about the Grocers' and Atlantic bank bills. This was before I had given Hooper back his cash. To my question Hooper replied, ' I took part of the Grocers' bills for New York funds. A part of the Atlantic bills were in exchange for our bills.' I think he said ' taken of Peabody.' Bearing in mind what Fay had said, I said to Hooper, ' Have you said any-thing about counting the money ? ' He replied, ' No ; you did not tell me till just two o'clock ; I had no opportunity of telling any one.' We were then in process of counting the money. The checks, bills and specie were found to agree with the bal-ance of cash, as stated in the ledger. I then put the question to the cashier, ' If he had ever seen anything in Hooper that would lead him to suppose he would favor banks or brokers ? ' He replied, ' No ; I believe him to be a strictly honest man.'

" The cash having been counted and found correct, Hooper was called in, and I told him we were satisfied, and to take his money. He gathered up his money, put it into the trunks, and locked it up and took it away. I remained with Fay in the directors' room, made a record of counting cash, and Fay and I certified it in the directors' record, as usual. The balance of cash is verified by these quarterly accounts. A certificate is made by directors of the result of the examination, and the cash is then delivered back to the teller. This is the usual course, and was done at this time. I had no suspicion of his integrity. I had no suspicion whatever that these bills were not all the property of the Merchants' Bank. I had not the slightest suspicion that they were obtained by fraud, or improper deal-ing with any person whatsoever. The delivery over to Hooper was precisely as usual. I don't know how soon he left the banking room. I should think it was nearly six o'clock when

I made the record.  After we had finished with Hooper and delivered him back his cash, I put the question to Fay, ' Who told you that the money was to be counted ?'  He replied, ' A friend of mine said he knew that I was coming to a counting of the cash this afternoon, and that friend did not care to have his name mentioned.'  I said, ' Not care to have his name mentioned ?  What did he say ?'  Fay replied that he said he knew I was coming to count the cash that afternoon, and that he should know it when we counted it again.  This was the first Fay said on the subject, except to ask the question why it should be known that the cash was to be counted.  I then said to Fay, ' After such a communication, it is due to the bank and Mr. Hooper that his cash should be counted suddenly.'  Fay said, ' Hooper is certainly an honest man.'  I said, ' I do not doubt it; but such a statement being made, it devolves on us to have another count.  You and I and the cashier will count his cash some day this week.'  I separated from Fay and went home, not having any suspicion against the integrity of the teller.  I most certainly should not have handed the cash back to the teller if there had been a deficit.  After the cash was handed back to him, he was left with its entire control, in the usual way, and no one to watch him.

" The next morning I came down to the bank a little earlier than usual.  Hooper was just entering the bank when I arrived.  I said to Hooper, ' I want to speak to you.'  He followed me into the directors' room.  I said, ' Mr. Hooper, I asked you yesterday if you had told any one that the money was to be counted ?'  He said, ' No ; I told you I had not.'  I said, ' Such a communication as that disturbed me a little, and I felt that I would speak to you, and ascertain if you had named it to any one.'  I asked why it should have been alluded to outside of the bank.  I told him I put great confidence in him, and should be satisfied with his answer, and wished, if there was any trouble in his private affairs, he would divulge it to me.  He said emphatically, ' The cash is right.  You have examined it, and know that it is right, and I have nothing to divulge.'  He reiterated what he said about the Grocers' and Atlantic bills,

and said : ' I told you how those bills were got ; ' and I told him I was satisfied. Hooper then said, ' I should like to be absent a few days to go to New York.' I said, ' Why be absent, Mr. Hooper ? I told you I would be satisfied with your statement. I don't wish you to go.' He replied, that it had been his intention to go to New York the day before Fast, and be absent to the end of the week ; and he should feel better to go now and come back at the end of the week, when I should be satisfied that the cash was right. I said, ' I don't wish you to go, but do as you please. If you see fit to go, go, and deliver your money to Mr. Stimpson.' He then said, ' You and the directors have put great confidence in me, and I am much obliged to you for it.' I did not displace him. I then turned to a person who had been waiting for me. I did not leave the directors' room for half an hour after Hooper had left it. I then went into the banking room, and saw the cashier in Hooper's place. I had not entertained the slightest suspicion of Hooper's integrity ; and his emphatic contradiction had given me the utmost confidence in him. I supposed that he was not to leave the bank till the close of business hours that day, and then come back on Friday or Saturday and resume his duties.

" The check for $25,000 was presented to the Merchants' Bank for payment when I was present. Payment was refused. It was replied, ' No funds to pay it ; the check is not good ; it is a fraud.' I cannot say what the words used in reply were. I think I said Hooper had no authority to certify. He had no authority. We paid no money on account of this check. A demand for the money was made on the 9th or 10th of April 1855.

" I knew afterward that Hooper did not go to the counter on the morning of the 27th, but he had full authority and was directed to go and take his place as usual. Stimpson took his place by my direction ; the fact was communicated to me that Hooper had not taken his place, at half past nine o'clock. I heard of Hooper's death before half past ten o'clock. After I heard of this, Peabody was in the bank that morning. He communicated to me the origin and the transaction of the

check of $25,000, dated March 26th.	I immediately made known his statement to the directors.	I referred him to the directors as they came in, to make his statement to them."

Luke Fay testified : " I attended the counting of the cash on the 26th of March.	We found the cash all right.	I did not find anything or see anything in the cash which led me to distrust the integrity of Hooper.	I saw the money handed back. If I had had the slightest suspicion of his integrity, or had found any deficit, I would not have assented to the delivery of the cash back to the teller."

The plaintiffs offered to surrender the check of March 25th 1855, and put it on file for the protection of the defendants.

Upon the evidence introduced by the plaintiffs, (the material parts of which are above stated,) the defendants offering none, the case was taken from the jury and reserved for the determination of the full court; with an agreement that the court, drawing such inferences of fact as a jury would be warranted in drawing, should enter such judgment as the law required, or order a new trial, if in their opinion one ought to be granted

The arguments were made at November term 1857.

*C. B. Goodrich & W. R. P. Washburn,* for the plaintiffs.

*R. Choate & A. H. Fiske,* for the defendants.

SHAW, C. J.	The amount in controversy in the present case is sufficient to give it a character of importance, and the principles on which it is to be decided require careful consideration. It is an action brought by one regularly incorporated city bank against another, to recover the sum of $25,000, which it is alleged by the plaintiffs has been fraudulently transferred from their own possession to that of the defendants, and the latter have no right in equity and good conscience to hold it against the plaintiffs.	The action was commenced on the 3d of May 1855, being *indebitatus assumpsit* for the above named sum and interest thereon	The answer denies that the defendants owe the amount as alleged.

There is no great conflict of evidence now on any material point, and the case upon the evidence is substantially this :

Thomas W. Hooper, who was the paying teller of the Mer-

chants' Bank, was a defaulter to a large amount. He was the principal teller, and had the immediate charge and custody of the cash funds within the bank; and other officers, who were necessarily entrusted with cash, accounted with him daily. In theory therefore he had, and at all times ought to have in his control, cash — that is always, be it understood, specie or bank notes — to the amount which he would appear to be charged with by the balance of the bookkeeper's account. That balance perhaps could not be struck till the close of each day's business, because during business hours each day the balance might be constantly shifting by the passing transactions.

It was the practice of the directors to examine and count the teller's cash occasionally, ordinarily as often as once a quarter. The purpose of this examination and count was to ascertain whether any cash had been withdrawn. The teller having no occasion and no authority to pay or receive money outside of the bank, if there was a deficiency it must be attributed to fraud or mistake, and it would afford one means of detecting either. On Monday, the 26th of March, shortly before the close of bank hours, the president gave notice to Hooper, the teller, that he and a committee of the directors would attend that afternoon to examine and count his cash. The object of giving this notice was that he might be there with his keys, ready to produce the cash as called for. Short as the time was, it gave Hooper an opportunity to carry into effect a fraudulent scheme, by which he was to obtain a sum of money to place with his own, whilst being counted, and thus fraudulently to conceal from the directors a knowledge of his defalcation.

A conspiracy had been deliberately entered into, between Hooper, the defaulting teller of the Merchants' Bank, Ward, a teller of the Atlantic Bank, and Peabody, a broker, to this effect; that Peabody should draw a check on the Merchants' Bank, where he had no funds, for $25,000; that Hooper should certify it to be "good;" that thereupon Peabody should take it to Ward at the Atlantic Bank, receive $25,000 of the bills of the Atlantic Bank, or other cash funds, take them back and deliver them to Hooper, to be placed with his own cash funds, and be

counted with them, as his own; after they had been so used, Hooper was to deliver back the like amount of $25,000 to Peabody, to be delivered to Ward, and replaced with the funds of the Atlantic Bank. In confirmation of this conspiracy, and that it was deliberate, it appears that the same thing had been actually practised on Thursday of the previous week, when Hooper had notice that his cash was to be counted; but that notice for some reason was not acted on, and the cash was not counted; the $25,000 taken from the Atlantic Bank in the manner before stated was restored to them by Ward, their teller. The same thing was again done on the 26th of March, near the close of bank hours, after the notice to Hooper, that his cash was then to be examined. Peabody drew the check, Hooper certified it "good," Peabody carried it to Ward at the Atlantic Bank, and received from him $16,000 in bills of the Atlantic Bank and $9000 in bills of other banks, carried them to Hooper, passed them to him over the counter of the Merchants' Bank, and they were placed by Hooper with the funds of that bank, of which he was the ordinary keeper within the bank. Peabody and Ward both knew of the purpose for which Hooper wanted the money; and it was the understanding between all of them, that the money was the next morning to be returned to Ward, and replaced with the funds of the Atlantic Bank, as had been done the week before, when taken for a similar purpose. The delivery of the money from Ward to Peabody was without the authority or knowledge of any other officer of the Atlantic Bank.

Pursuant to the notice given by the president of the Merchants' Bank to Hooper, the cash of that bank was counted on the afternoon of the 26th of March, by Haven, the president, and Fay, one of the directors. The above $25,000 was included and counted with the teller's cash, the amount was found to be correct, and a certificate to that effect was made and entered in the minutes of the directors. After it was thus counted, the whole amount was returned to Hooper, who put it into his trunks, locked them, and returned them to their usual places in the bank.

During this examination the suspicions of the president were somewhat excited by finding, as he thought, an unusual amount of the bills of the Grocers' Bank, and by finding two large pack-ages of Atlantic Bank bills, and he questioned Hooper about it, but he had no suspicion at that time of Hooper's dishonesty.

During the same afternoon, Fay stated to the president, that it was known outside the bank that the cash was to be counted that afternoon; and Hooper was asked if he had said anything about counting the money; and he said he had not.

After Hooper had received back his cash and left, some con-versation took place between Fay and the president, in which they expressed their confidence in the honesty of Hooper, but their surprise at the singular circumstance that it should be known out of the bank that the cash was to be then counted; and a proposal was then made and assented to have to another examination as soon as convenient, suddenly, that is without previous notice to the teller.

In consequence of these feelings the president determined to speak with Hooper the next morning. He went to the bank earlier than usual, a little before the ordinary bank hour for opening. Hooper was then just entering the bank; the presi-dent wished to speak with him; and they went into the direc-tors' room, when a conversation followed which is thus related in the president's testimony: " I said, ' Mr. Hooper, I asked you yesterday if you had told any one that the money was to be then counted.' He said, ' No, I told you I had not.' I said, ' Such a communication as that disturbed me a little, and I felt that I would speak to you, and ascertain if you had named it to any one.' I asked why it should have been alluded to outside of the bank. I told him I put great confidence in him, and should be satisfied with his answer, and wished, if there was any trouble in his private affairs, he would divulge it to me. He said, emphatically, ' The cash is right. You have examined it, and know that it is right, and I have nothing to divulge.' " Some other conversation took place. Hooper thanked the presi-dent for the confidence the directors placed in him, and expressed a wish to go immediately to New York, where he had been in-

tending soon to make a visit. Haven discouraged his going there, but told him, if he saw fit to go, to go, and deliver his money to Stimpson, the receiving teller ; not expecting however that he was to leave before the close of business that day. Haven did not displace him, and entertained no suspicion of his integrity Haven did not go into the banking-room till half an hour after, and then saw the cashier in Hooper's place. After the counting, the president and committee would not have handed back the cash to Hooper if there had been a deficit ; it was handed back to him and left in his entire control, in the usual way, without any one to watch him.

It appears that Hooper did not take his place in the bank room the next morning, and before half past ten committed suicide.

It further appears that on the 27th, after the death of Hooper by suicide had become known, Peabody, and afterwards Ward, went into the Merchants' Bank, and fully disclosed to Haven and other directors the facts and circumstances under which the check for $25,000 had been drawn by Peabody, and certified " good " by Hooper. Haven said to him, that Hooper had no right to certify such check, and the bank would not pay it.

In the morning of that day, according to the usual practice of Boston banks, Ward, the teller of the Atlantic Bank, received from the Merchants' Bank, by the messenger, the $16,000 of their own bills, and the $9000 of bills of other banks ; and Ward, in his official capacity, gave the Merchants' Bank credit for that amount, together with some few other bills. This was before the death of Hooper was known. The check was not then sent. But subsequently the check was sent with other funds, after the death of Hooper was known, but before twelve o'clock. The other funds were received by the Merchants' Bank and credited, but the check was refused payment, and subsequently on the same day protested by a notary public for nonpayment.

Perhaps it may not be necessary to state the facts more particularly ; some others may be referred to hereafter.

In the first place, it is obvious that this sum of $25,000 in cash — bank notes, used and treated for most purposes as cash,

in the same manner with specie — was transferred from the plaintiff bank to the defendant bank by means of a gross fraud and conspiracy, deliberately formed, carried into effect by three persons, with steady purpose and perseverance, attended with as much criminality and turpitude as can well characterize any transaction where rights of property only are violated. Hooper, the paying teller, intrusted with the actual custody of the whole cash of the Merchants' Bank, was under an old defalcation which he designed fraudulently to conceal; Peabody, a broker, and Ward, a confidential officer of the Atlantic Bank, entered into a fraudulent conspiracy with Hooper, with a full knowledge of his criminal purpose, to enable him to conceal this defalcation from his employers, first by abstracting the funds of the Atlantic Bank by an embezzlement amounting to larceny, and subsequently to defraud the Merchants' Bank by a similar embezzlement to be practised by Hooper. It is immaterial to any question here, who of these parties was the first to propose the scheme, or what motive personally actuated them respectively; they each knew of the criminal purpose, and each contributed in his own measure to accomplish it. It was a criminal conspiracy to do an unlawful act by unlawful means. The first act was that of Hooper, in indorsing Peabody's check.

The next consideration is, that by means of this fraud the money was taken from the Atlantic Bank, without their authority, and for which they received no consideration, and went directly into the cash funds of the Merchants' Bank, for which they paid no consideration; unless it was to be deemed a lawful payment of Hooper's defalcation, which we shall consider afterwards.

It was the property of the plaintiffs when it left their bank; the guilty agents, including Hooper, with full knowledge of the fraud, could acquire no title to it against the plaintiffs; Hooper could therefore give no title to the bank, as of right; nor could the bank hold the bills as negotiable securities, transferable by delivery, taken for a good consideration and in the ordinary course of business, nor as money, without some consideration paid. It appears therefore to be the ordinary case where one

46 *

party has received money, the property of another, which right-fully, equitably and in good conscience he cannot hold, and therefore the action of assumpsit for money had and received will lie for it.

It may be proper to consider whether money had and received is the proper remedy, or whether the action should have been in tort for the conversion of the bank bills. It appears that $16,000 of the $25,000 taken from the Atlantic Bank was their own bills. Had these been new bills, never issued by the bank, a scruple might arise, whether the bank without having delivered them would be bound as contractors. It is said that on this ground the Bank of England never issue a bill the second time, but take it up and cancel it. But here it is the universal custom of all banks to issue the same bills *toties quoties ;* so that when a bank bill duly executed is abroad, in the hands of a *bona fide* holder, the law will presume that it has been issued by the bank, and hold them to pay it. Stealing or embezzling from a bank their own notes, duly executed, and kept as cash to be paid out whenever the bank has occasion to make payment, has the same injurious consequences of defrauding the bank, as the taking of the bills of other banks held by this bank ; and the impossibility of identifying such notes, when out, as notes thus stolen, leads practically to the same result. Where the question is of an intent to defraud the bank themselves, and also to defraud other persons, stealing from a bank their own notes is to be considered an offence of the same character as that of stealing the notes of other banks. We do not perceive therefore that any distinction can be made between the $16,000 and the $9000. And the court are of opinion that as the bills in question were used and treated as money, and are now claimed to be held by the defendants as their own cash, the case comes within the general rule, that when bank bills are delivered as money and received as money, they may be considered as money for the purposes of remedy, and that averments of money had and received, money paid, money laid out and expended, may be sustained by proving such payment in bank bills, in the same manner as if paid in specie. Where money in bills was en

trusted to a carrier who lost it at play, it was held that the owner might recover the amount of the winner, in an action for money had and received. *Mason* v. *Waite*, 17 Mass. 560. *Cummings* v. *Noyes*, 10 Mass. 433. *Whitwell* v. *Vincent*, 4 Pick. 449.

It is a well settled maxim, that where chattels have been taken without title, and converted, so that the owner might maintain trover, if money has been received for them, he may waive the tort and maintain assumpsit for the money. It seems to follow that when the thing taken without title and converted is itself an article which is ordinarily regarded as money, this action will lie.

It is therefore, we think, to be considered in the same light as if by the same means they had obtained the money from the Atlantic Bank, and transferred it to the Merchants' Bank, in bags of current specie.

But further, it seems to us that these views are rendered entirely unnecessary by the fact, that before either bank had notice of the fraud, by which these bills passed from the possession of the one to the other, the Merchants' Bank, by their authorized officers, presented all the bills, as well the $16,000 of Atlantic Bank bills, as the $9000 of the others, to the Atlantic Bank, and received payment for them. It follows therefore that whether the defendant bank received these bills rightfully or wrongfully, with or without valid title, they presented them to the plaintiff bank, and received of them the full amount in cash; so that if the defendants are responsible in any form, it is strictly for money had and received.

We have said that this money came into the possession and under the control of the Merchants' Bank without any consideration passing from them, unless, as it is argued on the part of the defendants, it was received in payment of a debt due them from Hooper. The argument is this : that Hooper, being under a defalcation to a large amount, which he had kept concealed, obtained the money from the Atlantic Bank, and placed it in the Merchants' Bank, by way of payment of such balance, and that it is immaterial to the bank how he acquired the money to

pay them with, even if by fraud, if the bank did not know or participate in it.   But if the law were so, this argument, in our opinion, cannot be sustained by the facts.

Whether the transfer of a sum of money, from one party to another, operates as a payment of an existing debt or duty, depends upon intention, and the intention of both parties.   Such intention may often be implied from their relations and other circumstances.   But it must exist.   The bank could have no such intention, because, if there was any defalcation, it was not known to them, and any intent to receive this money in payment of such defalcation is negatived.

There was no payment in fact, no delivery of money, actual or constructive, from the hand or power of the one to that of the other.   Hooper, by clandestinely placing it with other funds of the bank in his own possession, for the purpose of deceiving the bank, did not part with the control over it; it was still in his own power.   Passing it to the committee, for the special purpose of being counted as the bank's, not as his, inducing them by fraud to believe that it was the bank's, and thereby precluding them from any inference or suspicion that it was his, was no act of transfer from Hooper, and could be accompanied by no intent to receive it as payment.   Hooper's presenting that sum of money to the committee for that purpose was a significant declaration on his part, that it was all money which, as their officer and agent, he had received as their due, in the regular course of their business ; and although this was a gross falsehood, it shows the state of mind in which their officers received and examined his money and returned it, and precludes the idea that they received it in payment.

But in truth it was not the intention of Hooper to transfer the money to the bank, for their own use, in satisfaction and discharge of the sum due them in consequence of his prior defalcations.   It was intended to deceive them by exhibiting these bills of which he himself was the keeper, and it was with the expectation and intent, as soon as that object was accomplished, to deliver them back.   Such a transaction could no more cancel and pay a debt than the exhibition of the same amount in counterfeit bills.

If it was a payment, it discharged Hooper and his sureties from all liability for such defalcation, which, as it seems to us, cannot be pretended.

Had this money been found in the custody of Hooper, on examining his cash after his death, and nothing had been shown as to the mode in which it had been acquired, it might have been presumed to have been received by Hooper, in his official capacity, for a valuable consideration, in the due and ordinary course of business, in which case it might well have been presumed to be the property of the bank. Such possession under such circumstances might have been a *prima facie* title. But here there is no room for these presumptions. The proof is, that it did not come into the possession of Hooper in his official capacity, in the ordinary course of business; but was procured and placed there by his fraud.

If the act of the president and Fay, in examination of the money, is relied on, as an admission on the part of the bank that Hooper had accounted for all the cash entrusted to him, and that the certificate entered on the books was a discharge to him ; the answer is, that certificate was obtained by fraud and cannot affect the bank; and further, that examination was made *alio intuitu ;* it was not an accounting, it was simply an examination, and the whole, when examined and certified, was redelivered to Hooper, and remained in his custody till the next day. In consequence of his suspicious conduct that morning, and his almost immediate death by suicide, other officers of the bank were put into possession of the bills thus left by him.

The argument is, that by the production of the money to the committee, as and for his balance, and by the certificate of the committee, the property and right to the money vested in the bank. But the answer is, that it was not produced as and fo his balance ; neither party had any such relation in view.

If the defalcation of Hooper, which was then not known to the bank, but which is now known to have then existed, was not discharged by the production and exhibition to the committee of these bills, then no consideration passed from the defendants to Hooper, or any one else, as the price of these bills, and

the defendants acquired their possession of them without consideration.

There is however another aspect in which the case may be considered, not essentially varying from the foregoing, but which may bring into view another legal element, that of knowledge of the fraud.

Undoubtedly the law intends, for wise considerations, to give the highest degree of credit to negotiable securities, payable on time not yet expired, taken for valuable consideration, in the usual course of business, without notice of any antecedent fraud or want of title which would vitiate them, the reasons for which are very strong and quite satisfactory. *Wheeler* v. *Guild,* 20 Pick. 545.

The credit given to bank bills in ordinary circulation is still higher, and the actual possession will be accompanied by a presumption of good title. The presumption perhaps is not so strong when bank notes are collected in large sums, and in the dealings of banks with them. Still, the presumption in either case is one of fact, and may be rebutted by evidence. And it will be rebutted in a case where the owner of bank bills proves that certain bills owned by him have been obtained from him by theft or fraud, and have passed from the fraudulent possessor to the defendant with knowledge of the fraud, and, if they have passed through the hands of several persons, that each had knowledge of such fraud. The holder, with the full benefit of the presumption of fact that he has a good title, cannot hold it against one who can prove a prior good title, not rightfully transferred to any one, though without such notice he would have held it. For the application of this principle, actual notice is not necessary ; constructive notice is sufficient. In the present case, there is not the slightest ground to suspect that the president or any officer or director of the Merchants' Bank had any actual notice of the fraud by which Hooper obtained these bills from the Atlantic Bank, or that he obtained them at all. They had no knowledge of his defalcation till after his death, when they obtained a knowledge of the facts from Peabody and Ward.

Had they constructive notice ? A bank is a corporation which can only act by agents; all the transactions of the bank, in buying or selling, borrowing and lending, every act by which they can convey property or acquire it, must be done by agents. When any one of these transactions is of such a character, that false representations, practice of fraud, or knowledge of fraud practised by another, would avoid the transaction, if done by an individual, it will equally affect a corporation, if done or had by the agent in the same transaction for a corporation. Suppose a corporation have occasion to obtain insurance, and the agent who negotiates it makes false representations, which would render the policy void, if made for himself; it will render it void as a contract with the corporation his principals; they will be affected with constructive notice. So, if a bank should have occasion to buy a horse for their messenger, and authorize him to buy one, and the agent should find one to his liking, and in negotiating about the purchase, should be informed that another man claimed that the horse had been obtained from him by fraudulent representations; it would be constructive notice of such claim to the bank.

In the present case, treating these notes obtained from the plaintiffs in the most favorable view, either as bank bills, or negotiable securities not discredited, or as specific property, the court are of opinion that the only title acquired in them being through the agency of Hooper, his knowledge of the fraudulent title under which he acquired and held them was constructively the defendants' knowledge, and they cannot hold them against the true owners.

Here the first step was an official act of Hooper, the paying officer of the bank, certifying that Peabody's check was good. It has been held, that a bank teller has no power to bind the bank by such a certificate, even if the fact is true when the check is presented; so that if not then paid, and other checks come in and the fund is paid out on them, the holder of such check has no remedy against the bank. *Mussey* v. *Eagle Bank,* 9 Met. 306.

But in the present case, it was a formal assertior under his

official signature to a stupendous falsehood. This was done to enable his guilty associates to make use of what appeared to them perhaps to be the credit of the bank. Possibly Ward believed that this was a good security, by means of which he could realize the money from the Merchants' Bank, and replace that of which he was defrauding his employers. At all events, we cannot say that without the intervention of this official act the fraudulent teller could have obtained the money he did. It was solely through the agency of Hooper, that the defendants acquired any title to the bills, or any possession of them. The whole transaction; his falsehood to the officers in saying that he told nobody that the money was to be counted that day, after he had notice from the president; when the evidence shows that this guilty machinery was all put in motion by notice to his guilty associates; all these circumstances show how deeply conscious Hooper was of a guilty purpose. If notice to the agent was constructive notice to the bank, then the bank took these securities under an invalid title, which cannot prevail.

Some cases were cited to show that where an agent has become indebted to his principal, and pays the balance in current money, the principal can hold the money, although obtained by fraud. This may well be conceded to be good law, when the money obtained by fraud is not obtained by the exercise of such agency, the agent makes no contract in behalf of his principals, and they take nothing and claim nothing through his fraud.

It was contended by the defendants, that the plaintiffs had waived their right to proceed against the defendants, and had affirmed the doings of Ward, in taking and claiming payment of the check. But we see nothing in the evidence to warrant this conclusion. No notice was had of the fraud until after the $25,000 in bills had been sent from the Merchants' Bank to the Atlantic Bank, and paid by the latter. That is, they were received and credited to the Merchants' Bank, but, according to custom, no settlement was made. Before twelve o'clock, but after Hooper's death, Ward made out another list, including the $25,000 check, with a few thousand dollars in bills, to pay the

balance due the Merchants' Bank. It came back by the mes·
senger, rejecting the check; by which their balance of $25,000
still remained due, which the check, if good, would have can-
celled. Then the cashier told Ward to give them specie credit
instead of the check. The specie credit was not given in satis-
faction of the check, but of a general balance due from the At-
lantic Bank to the Merchants' Bank. This was no confirmation
of the act of Ward in taking this check.

So of the presentation of the check for payment. It was
handed to the Atlantic Bank by Ward as a valid security for
what it purported to be, a check by Peabody on the Merchants'
Bank. The only proper course for the plaintiffs was to present
it, and leave it for the defendants to determine whether they
would pay it or not; and the protest was of no other effect than
to get evidence of the presentment of the check for payment,
and the refusal of the defendant bank to pay it.

If the plaintiffs had acquired a right of action, there was no
waiver in not bringing it immediately. Nothing done or fore-
borne by them was the cause of any loss or inconvenience to
the defendants, and no act is shown waiving any right.

A case was cited after the argument, which in its facts bears
such a resemblance to the present, that it seems to deserve a
separate consideration, though upon a careful examination it
appears to us to have been decided upon a principle not incon-
sistent with those adopted in this case. *Ingraham* v. *Maine
Bank,* 13 Mass. 208.

In order to compare the two cases, it is necessary to consider
who were the parties, and what was the question in the case
cited. It was a question, whether the sureties for the cashier's
good behavior, on a bond given on the 1st of June, were liable
for the delinquency complained of. The cashier was delinquent
before the 1st of June, and so continued to October, when an
examination of his cash was made by the directors. To meet
this, the cashier officially drew checks on other banks, received
the money and placed it with his own, but did not credit those
other banks with the amount; his cash therefore appeared right.
After the examination, he paid those other banks out of the

funds of his own bank, so that the transaction did not appear on the books of his own bank, and his deficit in fact stood as it did before the 1st of June, when the bond was given. The question was, whether at the time of the removal of the cashier, soon after this last transaction, the deficit then existing was chargeable to the obligors of the bond given on the 1st of June. There the money was borrowed of other banks by the cashier, in his official capacity, and under his general authority, to bind his bank by drafts, and they were responsible to those other banks, although, in the particular case, without any special authority, or any exigency of the bank requiring it. This might have been an act of misconduct on his part, though it would not impair the right of the banks with whom he dealt; unless his unlawful purpose was known to them, which was not suggested. The money thus raised by their cashier on their credit, and mingled with their cash, was their property in all respects; nobody could claim it by any prior title. The cashier's delinquency on that occasion consisted not in drawing the money, but in failing to credit it to the bank from which it was drawn, in order to deceive and mislead his employers. Not having treated the banks of which he borrowed the money as creditors of his bank, he regarded the drafts practically as a personal loan to himself. When therefore he afterwards took the funds of his bank to pay those drafts, it was done to carry out his fraud, to cancel his own debt; it was an unlawful embezzlement, of the character of larceny, practised then, and a violation of his duty, amounting to a breach of the bond given on the 1st of June, so that the sureties on that bond were liable.

The opinion of the court is very short, and does not fully express the grounds on which the judgment was rendered. The court say, that though a deficit existed before the execution of this bond, and might have been covered by an antecedent bond, yet the taking of money afterwards, to pay what he had thus (clandestinely) borrowed, was also a breach of the condition of this bond. "For the money, when placed in the vaults became the property of the defendants" (the bank); "and the transaction cannot be distinguished from an actual payment from his

own funds to supply the defalcation, and a removal afterwards of the funds of the bank without the consent of the defendants."

It is upon this last paragraph of the judgment, that we think it necessary to remark.   In that case, undoubtedly the money was the property of the bank, raised on their credit, and placed with their funds.  Besides that, as against the cashier, and those responsible for him, it was so far the property of the bank, that he would be estopped to deny it, and as against them it would be the property of the bank.   To take an illustration from the present case, suppose Hooper had had a secret hoard of his own outside the bank, and had procured from that $25,000 and placed it with his own for the examination of the committee, and they for some cause had, after counting it, withheld it and not returned it to him, he could not have reclaimed it; as against him the property would be held theirs.   But if, instead of such hoard of his own, he had fraudulently obtained it of another person, it would not be theirs, in a true and proper sense, that is, by a good and indefeasible title.   But what is more decisive of the correctness of the judgment in that case is this :  The court intimate that the facts taken together would perhaps prove a breach of both bonds, that anterior and that subsequent to the 1st of June ; and probably they would.  In that case, the breach by the prior misconduct would have caused no damage to the obligees, because by some means, right or wrong, the loss occasioned by it would have been repaired, and the judgment must have been for nominal damages only.   Whereas the breach by the subsequent misconduct, in wrongfully withdrawing the funds of the bank, was the very breach by means of which the obligees sustained their loss ; and it was no answer by the obligors on that bond, that the misconduct of the cashier originated prior to the bond given by them.

In the last clause the court say, " the transaction cannot be distinguished from an actual payment from his own funds." This shows how necessary and important it is, in construing judicial decisions, to consider them as made with a tacit reference to the subject matter, and the facts and circumstances of

each case, and with the limitations and qualifications implied thereby. The court say, the money, when placed in the vaults by the cashier, became the property of the bank. True, it did in that case, and would in all cases as against the cashier who had so placed it for such purpose ; but they do not mean to say that his placing it there, however acquired, would make it absolutely the bank's, to all purposes; the limitation was not expressed, because not necessary in that case. So " the transaction cannot be distinguished from an actual payment in his own funds," was true as to that case, and with a view to the judgment to be there rendered. The deficit under the first bond had been satisfied by funds produced by the cashier, and which the bank was not answerable to any one else for, no actual damage had been sustained by the bank, and if it could have a judgment it would be for nominal damages, and would afford no defence or relief to the obligors on the subsequent bond. For any purposes of that inquiry the transaction was not distinguishable ; but we are not therefore to infer that the bank can hold it against the true owner, merely because the cashier paid it in, if he procured it by such means that the true owner might recover it back. The decision therefore is not repugnant to the one which we now make, which is, that the plaintiffs are entitled to recover.

MERRICK, J. Being unable, after the most careful consideration, to concur in the opinion of the majority of the court, it seems to me proper, in a case of so much importance, both in reference to the magnitude of the claim made by the plaintiffs, and to the general principles involved in its decision, to state the reasons of my dissent.

The questions to be determined arise on a report of the presiding judge, which contains a statement of the whole evidence produced upon the trial. By the agreement of the parties, the court, drawing such inferences as a jury would be warranted in deducing from the facts proved, are to enter such judgment as the law requires.

It is in the first place to be noticed that there is no conflict of evidence, and that there is now no controversy or doubt in

relation to the facts or the transactions which actually occurred They may be briefly stated. Hooper was the paying teller of the Merchants' Bank. In that capacity he was entrusted wi·h and had in his possession all the cash of the bank, for which he was at all times immediately accountable on demand of the directors ; and the amount for which he was so accountable was always shown by and corresponded with the balance of cash charged on the ledger kept by the first bookkeeper. Before the 26th of March 1855 Hooper had secretly and fraudulently abstracted from the cash so entrusted to his care, and had applied to his own use large sums of money for which he was then the debtor of the bank, and legally obligated to make immediate payment. At about a quarter before two o'clock in the afternoon of that day the president notified him that the directors would meet at three o'clock in the same afternoon to count the cash of the bank, and that he would then be required to produce it. Knowing of the deficiency of the cash on hand, which existed by reason of his defalcation, he thereupon forthwith proceeded to supply himself with means which would enable him to present and deliver to the directors the whole amount of cash for which he was then liable, and thus satisfactorily to account to them for all the funds with the care and custody of which he had been entrusted. To this end, and in pursuance of a conspiracy previously concerted between the parties for that purpose, Peabody, who had no funds there, drew his check upon the Merchants' Bank for $25,000, and presented it, Hooper having first certified upon its face that it was good, to Ward, the teller of the Atlantic Bank. Ward, without any right or authority to do so, and knowing the unlawful and fraudulent purpose for which it was to be used, paid to him the amount of the check in money belonging to the plaintiffs, consisting partly, to wit, to the amount of $16,000, of bills of the Atlantic Bank, and partly in bills of other banks. Peabody immediately carried and delivered the same to Hooper, who received and placed all the bills so brought to him in the drawer where he kept the cash of the bank, and there all the bills remained until the arrival of the president at the time appointed for the meeting of the

47 *

directors. All the cash of the bank was then brought from the general banking room and delivered to him in the directors' room. He then commenced the proposed examination; first taking all the checks out of the drawers of the receiving and paying tellers, and making a list of them. Just as he had finished doing this, Fay, another of the directors, came in, and they proceeded to count the bills which had been brought in and presented to the directors as the cash of the bank. The bills of the Merchants' Bank were counted by Fay and the cashier, and all the bills of other banks, including those which Hooper had fraudulently procured through Peabody and Ward from the Atlantic Bank, were counted by the president. The aggregate of all the checks and bills so counted was found to be correct; that is, was found to correspond with the balance of cash charged on the ledger. The directors having thus completed their examination, found that all was right, and that there was no deficiency in the amount of cash to be accounted for, they then, according to the usual course of proceeding upon such occasions, made their certificate that the cash on hand corresponded in amount with the balance charged on the ledger; and they thereupon delivered that certificate to Hooper, together with all the money they had received from him, to be kept by him in his official capacity, for and as the property of the bank as before. This completed the service they met to perform, and they then withdrew, not having the slightest suspicion of the integrity of Hooper, or that any of the bills counted were not the property of the bank, or that any part of them had been obtained by him by fraud or by improper dealing with any other person. But early in the forenoon of the next day, and before any change whatever had taken place in reference to the bills which had been fraudulently obtained from the Atlantic Bank as before stated, the defalcation of Hooper, and the fraud which had been committed by him, in conspiracy with Peabody and Ward, were suddenly discovered, and all the facts became known to the parties who had been defrauded. The plaintiffs thereupon immediately demanded the bills or payment for them of the defendants, to which demand the latter refused to accede, but re-

tained the bills, and applied them, under a claim of right thereto, to their own use.

When that demand was made, the bills which had belonged to the plaintiffs, and of which they had been fraudulently deprived by the tortious and criminal acts of the conspirators above stated, were in possession of the defendants. And therefore the real and only question is whether, in the circumstances under which they received the money, they thereby did upon the settled and established principles of law acquire a legal title to it, so that it at once became their property. There seems to be no peculiar equity in favor of either of the parties, which should be allowed to affect or vary the application of those principles. The teller of each of the banks had been guilty of gross and inexcusable fraud; and the loss, by whichever of them it is to be sustained, is the direct and necessary consequence of the criminal misconduct of one of their own officers. Their respective claims are therefore to be ascertained on the application of strict principles of law to the state of facts which had occurred, and which existed at the time when the perpetration of the fraud was discovered.

There can be no doubt or uncertainty, nor is any difference of opinion entertained, as to what the rule and principle of law applicable to the case is. This is perfectly well settled. The *bona fide* holder of negotiable paper, payable to bearer or indorsed in blank, who has taken it innocently in the due course of business and for a valuable consideration, may recover upon it, though it came to him from a person who had robbed or stolen it. So if a promissory note or bill of exchange is made without consideration, or is lost or stolen, and is afterwards negotiated to one having no knowledge of these facts, for a valuable consideration and in the usual course of his business, it thereupon becomes his property, his title to it is indisputable, and he may recover the amount of it from the drawee or maker. 3 Kent Com. (6th ed.) 79. *Wheeler* v. *Guild,* 20 Pick. 545. *Stevens* v. *Blanchard,* 3 Cush. 169. This is peculiarly true in reference to bank bills or notes which circulate as currency; and so it was expressly adjudged in the early case of *Miller* v. *Race*

1 Bur. 452. And this principle, stated in the plainest terms in the opinion pronounced in that case by Lord Mansfield, has never since been questioned, but has been uniformly approved and upheld, and is now everywhere the acknowledged doctrine of the law. No more direct or positive decisions in affirmance of it can be found than in the adjudications of this court. Thus in the case of the *Worcester County Bank* v. *Dorchester & Milton Bank*, 10 Cush. 488, which was action brought upon a bank bill of the defendants for fifty dollars, which had never been issued by them, but which in a complete state of preparation for issue had been forcibly stolen from the vault of their banking house, it appearing that the plaintiffs obtained and came by the bill fairly, it was determined they were entitled to recover, although they had been informed of the robbery before commencing their suit; and judgment was accordingly rendered in their behalf. In the later case of *Wyer* v. *Dorchester & Milton Bank*, 11 Cush. 51, upon an exactly similar state of facts the same doctrine was again distinctly affirmed; and it was there also held, in conformity to repeated decisions to the same effect in other courts, that the mere possession of a bank note or bill, in the absence of any evidence to control or explain it, affords a conclusive presumption that it was received by the holder for value in the due course of trade, and that he is in such case to be considered the true and lawful owner. *Solomons* v. *Bank of England*, 13 East, 135. *King* v. *Milsom*, 2 Campb. 5. *De la Chaumette* v. *Bank of England*, 9 B. & C. 208.

But no question arises here concerning the burden of proof, for there is no dispute or controversy concerning the facts, which are all clearly developed in the evidence, and perfectly well known. It is therefore necessary only to ascertain the legal effect and consequence of these facts, and whether they show, as the defendants contend that they plainly and incontrovertibly do, that they received the particular bank bills demanded of them and to recover the value of which this action is prosecuted in the usual course of their business, for a valuable consideration and in good faith, without notice, direct or constructive, of the fraud by means of which they were obtained from the plain-

tiffs. If this is shown, then, on the application of the above stated principle of law, it results as a direct and necessary consequence, that by the transfer to them under such circumstances they became the owners of the bills by a complete and indisputable title. The investigation of the several parts of this general proposition involves the inquiries, when, from whom, and for what consideration, did they receive the bills; did they receive them in good faith; and had they at the time of receiving them any notice, direct or constructive, of the fraudulent means by which Hooper had obtained them.

1. These bills were first received by the defendants at the time when, upon the call of the directors upon Hooper for the cash for which he was accountable, they were carried into the directors' room, and were there delivered to them to be, with the other bills and checks produced at the same time, by them examined, counted and disposed of as the property of the bank. Before and up to that moment, these bills were in his possession and under his sole control. He had indeed placed them for safe keeping in the drawer in which he kept the bills and money of the bank, but he had not passed or attempted to pass them or the property in them to the bank or to any one else until he produced and delivered them to the directors. He procured and kept them strictly for a purpose of his own, and that purpose was simply and solely to exhibit and deliver them to the directors when he should be called upon to account, and when he should profess to account, for the balance of cash charged to him on the ledger, and for which he was, and knew that he was, at all times accountable. He retained them himself, and had it now in his own power, without any obstruction or hindrance from any other person, at any moment before they were so passed over and delivered to the directors, to take them away and restore them to the plaintiffs. And if he had done so, as he might and as he certainly ought to have done, he would not thereby have interfered with the property, or violated any of the rights of the defendants. For as he had the sole and exclusive possession of these bills, and continued to retain and maintain the custody of them until in accounting for his own

liabilities to the bank he passed them over to the directors, the defendants certainly could not before that was done have received or acquired any title to them.

2. When the defendants thus through their directors received these bills of Hooper, they took them in the due course of their business, and for a valuable consideration. The examination of the assets of the bank, and everything which was done by the directors on the afternoon of the 26th of March, were in accordance with the established practice and the course of proceeding prescribed by the express agreement of the board. The definite and exact object of all such examinations, and particularly of that which was made that day, was to ascertain if the bank was in the actual possession of all the money to which, according to the balance charged on the ledger, they were entitled. And as it is the business of the teller to keep all the cash, and his duty to produce and deliver it to the directors on their demand, such an examination and count of the bills and money by them necessarily involves the full accounting by the teller for the whole cash of the bank, according to his official and personal liability. And accordingly Hooper, being called upon for this purpose, in conformity to the established practice and usual course of proceeding in such cases, produced and delivered to the directors various checks and bills, and among them those which he had fraudulently obtained from the plaintiffs, as the property of the bank. The directors received them all, counted them all, and treated them all, as such, making no distinction, and knowing of none, between the different parcels of which the whole consisted. And in the unsuspecting belief and confidence that all the bills, thus delivered into their possession by Hooper to be examined and counted by them, belonged to the bank, that all was right, and that he had in this way fully accounted for all the money entrusted to his care, and had thereby discharged himself of all his liabilities relative thereto, they accepted the bills and checks so received of him for the bank in full satisfaction and discharge of those liabilities. And thereupon, in exercise of their official discretion and authority, they redelivered to Hooper all the bills they had received from him, that he might

thereafter keep them for and as the property of the bank. This, as is positively stated in the testimony of both Haven and Fay, they would not have done, if upon their examination there had appeared to be any deficiency in the amount of money which ought to have been found in the possession of the teller; much less, if they had known or suspected that he was a fraud-ulent defaulter.

It is thus shown that these particular bills, together with all the other bills and checks produced and delivered by Hooper to the directors, the whole being indiscriminately intermingled so far as they could perceive, were received by them for and on behalf of the defendants in consideration of his liability and indebtedness to them for the balance of the money which he had theretofore received, and for which he was then immediately responsible, and that those bills were thus accepted in full discharge of all such liabilities on his part up to that time. That, of course, was a full and valuable consideration.

But in another aspect of these transactions, it has been argued on behalf of the plaintiffs that the defendants did not pay or allow any consideration for these bills; because Hooper did not pay them in direct and avowed satisfaction of the indebtedness which resulted from his defalcation, but used them only to conceal it by diverting in that way for a brief period the attention of the directors, so that they would make no inquiries upon the subject; and because the directors, not knowing of any such defalcation, could not have accepted or received them in payment or discharge of the consequent indebtedness. Without doubt, it was the intention and design of Hooper to cover up and conceal his fraud and defalcation from the knowledge of the directors. But it is equally plain and certain that to effect this purpose he did in fact pass over to them and into their possession all the bills which he delivered to them, in order thereby to account in full for his entire liability for the whole of the money which had been intrusted to him, and for which he was responsible. They received and accepted these bills in due course, and gave to him a corresponding credit and discharge therefrom. Thus in this one material and decisive particular

each of the parties intended that the bills should be applied to one and the same object. That object was the accounting for, and the consequent settlement and satisfaction of their claim for the balance of cash charged in the ledger ; for which balance he then admitted himself to be liable, and the amount of which they were entitled in any event to recover, equally whether they knew, or whether he had in fact been guilty, of any defalcation or not. It is therefore obvious and certain that all the bills which he delivered to the directors, and which they, acting in good faith, received and accepted for that purpose, were transferred to the defendants in satisfaction of their claim and of his liability therefor, and consequently were taken by them upon a good, valuable and adequate consideration.

3. And in accepting all the bills which were delivered to them for that purpose, it is clearly shown that they acted in the most perfect good faith. The directors not only had a right, but it was their duty, from time to time, and at all such times as they should to that end appoint, to call upon the teller to account for the cash and funds entrusted to him and committed to his keeping. In the exercise of that right, and in the usual and ordinary course of proceeding in all like cases, they called upon Hooper to produce and submit to their inspection and examination the money of the bank in his possession. In compliance with that call, he produced and delivered to them divers parcels of checks and bank bills, the aggregate of which they found upon careful scrutiny to be equal to, and exactly to correspond with, the amount of his liability according to the balance charged upon the ledger. They had not the slightest suspicion of his integrity in that or in any other transaction, or that all the bills exhibited and delivered to them did not justly belong to the bank, or that any part or parcel of them had been in any manner obtained of any person by fraud, or by any fraudulent means or practice. Such is the positive testimony of Haven and Fay ; and there is nothing in any part of the evidence having the least tendency to create any distrust of the truth of their assertions. Indeed, nothing of this kind is suggested or pretended. If there were any such pretence, the significant fact that at the close of

their examination they unhesitatingly returned to Hooper all the money of the bank, to be kept by him as before, would be quite sufficient to refute it. This affords the strongest proof that they had no suspicion of him, and that their confidence in his upright-ness and integrity remained unimpaired. It is easy to believe them when they say that, if any deficiency had been discovered, none of the cash would have been again and at once intrusted to him ; but in view alike of their duty and interest, and of the motives which would probably influence all men in the like circumstances, we may be sure that if they had suspected or found cause to suspect that he had robbed their own, or had been an active participant in a conspiracy with others to rob or embezzle the funds of any other institution, they would not for a moment have thought of again placing their money in his pos-session, and of affording him thereby further and renewed oppor-tunities to cheat and defraud them.

It is thus clearly proved, and it is in fact substantially con ceded by the plaintiffs, that the directors who, in behalf of the defendants, were the immediate recipients of the money paid over to them by Hooper in accounting for his official liability, acted with the utmost fairness and integrity ; and that neither they, nor any officer, agent or other person in the employment of the bank, had any direct notice of any of the wrongs which he had committed or of the frauds which he had perpetrated. It follows, as a necessary consequence from these proofs and concessions, that the defendants had no notice at all of the fraudulent means and acts by which he procured the money, unless they are to be affected by an alleged constructive notice, on the ground that the money fraudulently obtained by him came to them through his hands as one of their officers.

It is no doubt true that in general the principal is to be af fected by the acts, conduct and knowledge of his agent, when the latter is acting for him, on his account, or within the scope, limits or powers of the agency. But it is not true that he is to be so affected, where one who is for some certain, special, defi-nite and carefully prescribed purpose constituted an agent, does acts which are not within the scope of his duty or authority as

such, but wholly beyond and different from it; and does them solely and exclusively for himself and for his own benefit and advantage. In all such cases he alone is responsible. All the consequences of his acts attach exclusively to him, and are not to affect or to be shared in by any other person who, for other and wholly different purposes, may stand to him in the relation of a principal.

As soon as these plain and familiar rules are applied to the facts in the present case, it becomes at once apparent that the defendants cannot be charged with constructive notice on account of the knowledge of Hooper of his own misconduct and criminality. In nothing that he did to carry out, with the aid of his guilty associates, his premeditated scheme of fraud and deception, either in obtaining the money from the plaintiffs, in secreting it for a brief time in his own drawer, or in the exhibition and presentment of it to the directors, was he acting or assuming to act in his official character or relation, or as an officer or agent of the defendants. On the contrary, his position and proceedings were in every respect adverse and antagonistic to them. He acted solely for himself, and for the accomplishment of his own secret and unlawful purposes; exclusively for his own interest, his own protection, and to secure to himself continuance in office, and thereby renewed and prolonged opportunities of dealing with their money at his own pleasure and in execution of his own fraudulent designs. He meant to deceive them; he got the money and used it for that purpose. He undoubtedly intended, first to pay it to the bank in satisfaction of his liabilities, and, as soon as possible afterwards, to withdraw, embezzle and apply it to his own use. And if the hour of detection and exposure had not suddenly and unexpectedly occurred, he probably would, as he promised his associates, have withdrawn the same or an equivalent amount of money, and have restored it to the plaintiffs. But he was detected and lost the opportunity of consummating his intentions in this particular; and his failure and miscarriage at last cannot qualify or affect the rights of the defendants or the character of his own preceding acts. These fraudulent acts of his having

been in every respect, in deed and purpose, hostile and contrary to his duty towards them, and concealed, as they were intended to be, wholly from their knowledge, are not to be construed as affording constructive notice to them of the way and manner in which he obtained the money which they in good faith received from him.

From these considerations it appears to me to be clearly and conclusively shown that the inferences and the only inferences which a jury would be warranted in deducing from the evidence and from the facts proved or conceded on the trial are, that the money which Hooper fraudulently obtained from the plaintiffs was delivered by him to and received by the defendants in the usual and ordinary course of their business, for a full and valuable consideration, in good faith and without notice, direct or constructive, of the fraud perpetrated by him in obtaining it. This proposition being established, the necessary legal conclusion from it is that, when the money was so received by them, they acquired a perfect and complete title to it, and that no action can be maintained to recover it from them. I think therefore that, in pursuance of the agreement of the parties, judgment should be entered for the defendants.

In this conclusion, for the reasons before stated, I am authorized to say that Mr. Justice Bigelow fully concurs.

*Judgment for the plaintiffs.**

* See *Skinner* v. *Merchants' Bank*, 4 Allen, 290.